**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

_____

| | |
|---|---|
| DANNY R. LOVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 20-cv-2813-SHL-tmp |
| | ) |
| ST. JUDE CHILDREN'S | ) |
| RESEARCH HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

_____

**REPORT AND RECOMMENDATION**

_____

On November 9, 2020, plaintiff Danny R. Love filed a _pro se_ complaint against his former employer, St. Jude Children's Research Hospital ("St. Jude"), alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1 at 1.) Using a form provided by the Clerk's Office to assist _pro se_ litigants asserting employment discrimination claims, Love checked boxes alleging discrimination based on race and gender/sex, and unlawful retaliation. (Id. at 3-4.) Presently before the court is St. Jude's Motion for Summary Judgment, filed on November 1, 2021.[1] (ECF No. 3.) Love filed a response on November

_____

[1]Pursuant to Administrative Order No. 2013-05, this case has been referred to the United States magistrate judge for management and for all pretrial matters for determination or report and recommendation, as appropriate.

18, 2021, an opposition to St. Jude's statement of undisputed material facts on November 22, 2021, and his own statement of undisputed material facts on November 23, 2021. (ECF Nos. 34-36.) On December 3, 2021, St. Jude replied and filed an opposition to Love's undisputed statement of facts. (ECF Nos. 38-39.)

For the reasons below, the undersigned recommends that St. Jude's Motion for Summary Judgment be granted.

## I.   PROPOSED FINDINGS OF FACT

### A.   Summary Judgment Briefing

As an initial matter, although Love filed a response that addresses St. Jude's statement of undisputed material facts, as well as his own statement of facts, none of his filings include citations to the record. (ECF Nos. 35-37.) Local Rule 56.1 requires that a party opposing a motion for summary judgment "must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." LR 56.1(b). Furthermore, "[e]ach disputed fact must be supported by specific citation to the record." Id.

Similarly, Rule 56 of the Federal Rules of Civil Procedure requires that a party support or challenge factual assertions by:

> (A) citing to particular parts of materials in the
> record, including depositions, documents,
> electronically stored information, affidavits or
> declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
>
> (B) showing that the materials cited do not establish
> the absence or presence of a genuine dispute, or that an
> adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1). When a party fails to properly challenge an opposing party's assertion of fact, Rule 56(e)(2) permits the court to "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); see also LR 56.1(d) ("Failure to respond to a moving party's statement of material facts . . . within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). The court need not consider any unsupported factual assertions.[2] See id.; see also Gunn v. Senior Servs. of N. Ky., 632 F. App'x 839, 847 (6th Cir. 2015) ("'[C]onclusory and

---

[2]This includes any factual allegations contained in Love's unsworn response brief to St. Jude's Motion for Summary Judgment. See Wallace v. Brown, No. 2:17-cv-02269, 2020 WL 4228310, at *3 (W.D. Tenn. Jul. 23, 2020) ("Wallace's memorandum is unsworn and is not competent summary judgment evidence."); see also King v. UT Medical Group, Inc., No. 09-2080-SHM-dkv, 2011 WL 13269768, at *3 (W.D. Tenn. Mar. 3, 2011) ("The Court cannot consider any factual assertions that are made in legal memoranda or that are not sworn to under penalty of perjury.").

unsupported allegations, rooted in speculation,' are insufficient
to create a genuine dispute of material fact for trial.") (quoting
Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir. 2003)).
Accordingly, the statement of undisputed material facts filed by
St. Jude, which are supported by sworn declarations and/or
citations to the record, are deemed undisputed for the purposes of
resolving this summary judgment motion.

**B.    Love's Employment History with St. Jude**

Danny Love was hired by St. Jude as an Affiliate Financial
Administrator in the Affiliate Program Office ("APO") on December
8, 2014. (ECF No. 31-3 at 1)(citing Pl.'s Dep. at p. 21 lines 22-
25, p. 22 lines 1-5). The APO manages the relationship between St.
Jude and eleven affiliated hospitals or clinics in cities other
than Memphis with whom St. Jude has contracts. At these hospitals
patients can receive treatment without coming physically to St.
Jude. (Id.)(citing Pl.'s Dep. at p. 22 lines 23-25, p. 23 lines 1-
11). Love's primary job responsibilities related to processing
affiliates' invoices pursuant to the affiliates' contracts with
St. Jude, ensuring payment of invoices, and conducting a quarterly
invoice review where he summarized the invoices, their payment,
and the effect on the affiliates' budgets, among other finance-
related responsibilities. (Id. at 2)(citing Pl.'s Dep. at p. 24
lines 7-25, p. 25 lines 1-9; Ex. 3 to Pl.'s Dep.).

Love's supervisor at the time of his hiring was Cindy Burleson (a white female), the then Administrative Director of the APO, who left St. Jude in September 2017. (Id.)(citing Pl.'s Dep. at p. 22 lines 12-15, p. 23 lines 5-12). When Burleson left, Love was briefly supervised by Carolyn Russo, M.D., the Medical Director of the APO (a white female). (Id.)(citing Pl.'s Dep. at p. 23 lines 1-4 and 15-19). In January 2018, Edna Patterson (a black female) was hired as the Administrative Manager of the APO and became Love's supervisor.[3] (Id.)(citing Pl.'s Dep. at p. 23 lines 20-22). Patterson conducted Love's annual performance review in September 2018, referring to his work for the year, and Love did not make any comments disputing that Patterson was the appropriate person to perform his annual review. (Id.)(citing Ex. 8 to Pl.'s Dep.).

**C.    Love's Job Performance and Termination**

On July 10, 2018, Patterson sent an email entitled "FY19 Preview – Changes, Challenges and Opportunities," which outlined certain challenges the Department faced and posited that "[b]ecause of these new strategic goals, old habits and routines must be replaced with a sound APO infrastructure." (Id.)(citing

---

[3]At his deposition, Love disputed that Patterson was his supervisor in early 2018, although he has failed to produce any document or provide any factual support for this position that would create a genuine dispute of material fact. (ECF No. 31-3 at 2, n.2)(citing Pl.'s Dep. at p. 76, lines 16-25, p. 77 lines 1-14).

Ex. 4 to Pl.'s Dep.). Patterson attached an attendance policy to this email and clarified that "all employees (non-exempt and exempt) are expected to work a 40-hour work week, Monday-Friday (8 hours a day)" and uniformly instructed APO employees to "[p]lease [] not work from home, after hours, or weekends as part of your 40-hour work week." (Id. at 2-3)(citing Ex. 4 to Pl.'s Dep.). Love received a copy of this email and understood it to include him. (Id. at 3)(citing Pl.'s Dep. at p. 26 lines 4-13).

On July 12, 2018, Love received a counseling memorandum for poor work performance, based on an April 17, 2018 invoice for $204,462.78 from the Peoria, Illinois affiliate that was not processed or paid. Part of Love's job description was to "ensure[] payments are approved in a timely fashion and in compliance with contracts." (Id.)(citing Pl.'s Dep. at p. 26 lines 22-25, p. 27 lines 1-17, p. 28 lines 1-24; Exs. 5 and 6 to Pl.'s Dep.). This unprocessed payment was discussed at a June 27, 2018 finance meeting. Patterson followed up with Love after the meeting on July 5, 2018, and asked why the status report for quarterly invoices was not on the shared drive accessible to her and others in the APO. (Id.)(citing Ex. 5 to Pl.'s Dep.). Love took the position that it was not his responsibility to ensure the invoice was paid. (Id.)(citing Ex. 6 to Pl.'s Dep.; Pl.'s Dep. at p. 29 lines 9-25, p. 30 lines 1-7). In response to the counseling, Love submitted a

Response Memorandum and made a complaint to Kynis Douglas with St. Jude's Employee Relations Department. (Id.)(citing Ex. 6 to Pl.'s Dep.). Dr. Russo submitted a written reply to Love's Response Memorandum on July 26, 2018, concluding that the counseling memo was warranted and encouraged him to seek a St. Jude finance mentor to develop proper policies and procedures, and to review the financial and budgetary policies and procedures available in the APO shared drive. (Id.)(citing Ex. 7 to Pl.'s Dep.).

Two months later, on September 13, 2018, Love received his annual performance review from Patterson, wherein she also recommended that Love seek a finance mentor and that he enroll in professional development courses to improve job performance. Love made no comments about this review. (Id. at 4)(citing Ex. 8 to Pl.'s Dep.; Pl.'s Dep. at p. 32 lines 10-23). On September 25, 2018, Dr. Russo exchanged emails with Love containing feedback on observed performance errors by Love, noting two invoice approval sheets with date errors. (Id.)(citing Ex. 9 to Pl.'s Dep.). In response, Love pointed out a typographical error by Dr. Russo but admitted that the errors she noted from the invoice approval sheets were "careless" and "embarrassing." (Id.)

On October 15, 2018, Patterson met with Love for his fall performance check-in, wherein she discussed with him that he was not meeting performance and behavioral expectations for his role.

Specifically, she noted that he needed to minimize errors by "creating checks and balances in his spreadsheets to account for financial and descriptive errors." (Id.)(citing Ex. 13 to Pl.'s Dep.). Patterson summarized this meeting in a Memorandum to Love dated October 22, 2018, which contained feedback and provided long-term goals for Love while noting his "consistent errors" in work output. (Id.)(citing Ex. 14 to Pl.'s Dep.; Pl.'s Dep. at p. 91 lines 8-23).

In the months that followed, Patterson and Dr. Russo continued to give Love feedback regarding his habit of coming to work late and leaving early, as well as other performance concerns. Love forwarded each of these conversations to Douglas with St. Jude Employee Relations. (Id.)(citing Exs. 15, 16, & 17 to Pl.'s Dep.). For example, in one exchange of emails on December 19, 2018, Patterson noted that "I recognize this leadership transition over the past year has presented challenges/conflicts when compared with the perceived prior leadership laissez-faire approach," noting (1) that Love was not present in the office at 4:04 p.m. on a Monday when she and Dr. Russo needed a document from him; (2) that he had also not placed that document on the APO shared drive; and (3) that Love made an error in the ETSU quarterly invoice sheet that would have resulted in an overpayment to the affiliate in the amount of around $68,000 had it not been discovered. (Id. at 4-

5)(citing Pl.'s Dep. at p. 107 lines 10-25, p. 108 lines 1-25, p. 109, lines 1-6; Ex. 17 to Pl.'s Dep.).

In January 2019, Patterson and Love exchanged emails wherein Patterson reiterated the expectation that Love notify her or Dr. Russo when he would be late or leaving early, and reminded Love that both exempt and non-exempt employees are generally expected to work eight hours per day and forty hours per week. (Id. at 5)(citing Ex. 18 to Pl.'s Dep.). On January 25, 2019, Patterson gave feedback to Love on the recently-submitted quarterly invoice reviews, noting there were several errors in the reports, which Love acknowledged. (Id.)(citing Ex. 19 to Pl.'s Dep.).

On February 5, 2019, Love signed a "General Expectations Document," sent to all APO staff, which affirmed the expectation that all employees would notify their supervisor if they left in advance of their eight-hour shift, which Love acknowledges signing. (Id.)(citing Ex. 20 to Pl.'s Dep.; Pl.'s Dep. at p. 128 lines 13-19). On February 15, 2019, Patterson emailed Love notifying him that she could not find him the prior afternoon and asking what time he left the office. Love responded that he left some time after 4:00 p.m., and Patterson observed that he did not notify her or Dr. Russo that he was leaving early. (Id.)(citing Ex. 21 to Pl.'s Dep.). On February 22, 2019, Love was issued a Corrective Action Notice with a Verbal Warning for regularly

leaving the office early without notifying someone in the APO
leadership. (Id. at 5-6)(citing Ex. 22 to Pl.'s Dep.). Love
responded to the Verbal Warning by filing a written complaint,
wherein he stated "[a]s an exempt employee, I do not have a
specific scheduled shift," and that he did not believe he was
required to notify leadership when he left. (Id. at 6)(citing Ex.
22 to Pl.'s Dep.). Patterson upheld the Verbal Warning on review
on March 8, 2019, noting that she and Dr. Russo had repeatedly
provided feedback on Love's attendance since 2018 and that he was
aware of the attendance expectations. (Id.)(citing Ex. 23 to Pl.'s
Dep.).

On March 28, 2019, Patterson met with Love for his spring
performance check-in, wherein she noted his attendance issues and
errors in quarterly invoice reports, and again suggested that Love
obtain a finance work mentor. (Id.)(citing Ex. 24 to Pl.'s Dep.).
On April 24, 2019, Patterson sent Love feedback on the second
quarter Quarterly Invoice Report, noting discrepancies in dollar
amounts and descriptive omissions, including a $10,745 overpayment
to a Charlotte affiliate. (Id.)(citing Ex. 25 to Pl.'s Dep.). Love
admits to these errors. (Id.)(citing Pl.'s Dep. at p. 147, lines
14-15).

On June 28, 2019, Patterson and Love exchanged emails
regarding Love's resistance to placing all APO financial documents

on the shared T://drive. Patterson gave Love a deadline of Friday, July 12, 2019, to place all St. Jude documents on the APO's shared T://drive so that they could be accessed as-needed by relevant employees. (Id.)(citing Ex. 27 to Pl.'s Dep.). Love refused to do so and stated that it was his personal practice not to place documents on shared drives for security purposes, to which Patterson responded by noting that the "development and maintenance of centralized electronic financial files for the department[]" was in his job description. (Id.)(citing Ex. 28 to Pl.'s Dep.).

Two weeks later, on July 10, 2019, Love received a Written Warning for unsatisfactory work performance, citing his lack of attention to detail, incomplete/inaccurate reporting, and lack of timely follow-through. The Warning noted that Love had been previously counseled on these issues at his spring performance check-in. (Id. at 6-7)(citing Ex. 29 to Pl.'s Dep.). At Love's request, Patterson sent him a detailed outline of the support for the Written Warning, including the second quarter $10,745 overpayment to the Charlotte affiliate, his consistent lack of follow-through, his failure to place items on the shared drive as he had been repeatedly instructed, and his consistent lack of attention to detail, including the incorrect dates being noted on his financial reports. (Id. at 7)(citing Ex. 30 to Pl.'s Dep.).

- 11 -

Love appealed the Written Warning through St. Jude's Complaint Resolution Process, and the Complaint Resolution Committee of St. Jude upheld the Written Warning. (Id.)(citing (Exs. 31 & 32 to Pl.'s Dep.).

Love's 2019 annual performance review occurred in August 2019, wherein he received an overall rating of unsatisfactory contribution. (Id.)(citing Ex. 33 to Pl.'s Dep.; ECF No 31-5). On September 27, 2019, Patterson sent a letter to St. Jude's Employee Relations Department, requesting that senior leadership terminate Love, detailing in four pages the negative impact on the APO of Love's continued employment. She argued that (1) based on her analysis, Love's position was functioning at a 0.3 full-time equivalent (as opposed to a 1.0 full-time equivalent justifying a full-time role); (2) he regularly arrived between 9 and 9:30 a.m. and would depart between 3 and 4 p.m.; (3) he regularly had inaccuracies in work output; and (4) there was frustration among the APO staff and leadership with these performance and attendance issues. (Id.)(citing ECF No. 31-6). On September 30, 2019, Dr. Russo notified Douglas with St. Jude Employee Relations by email that she was recommending Love for termination "[b]ased on the verbal warning for lack of attendance, the written warning of poor work performance, the FY19 performance evaluation and the most

recent FY19 Quarter 4 invoice review documenting 6 of 11 invoices with errors." (Id. at 7-8)(citing ECF No. 31-7).

On October 28, 2019, Love was terminated for poor work performance, with his separation paperwork indicating the reasons being his lack of attention to detail, incomplete/inaccurate reporting, lack of timely follow-through and inaccurate payments as documented by the quarterly invoice audit and reconciliation process. (Id.)(citing Ex. 35 to Pl.'s Dep.; Pl.'s Dep. at p. 189 lines 19-25, p. 190 lines 1-13). On November 4, 2019, Love sent a letter requesting reconsideration to Dana Bottenfield, the Senior Vice-President of Human Resources for St. Jude. (Id.) (citing ECF No. 31-8). On November 15, 2019, Bottenfield sent Love a Complaint Resolution Letter, upholding his involuntary separation upon review by the Complaint Resolution Committee. (Id.)(citing ECF No. 31-9).

## D.  Love's Complaints to St. Jude

For over a year, Love forwarded complaints regarding the feedback and discipline he received at St. Jude to Douglas with St. Jude Employee Relations. (Id.)(citing ECF Nos. 31-10 & 31-11; Pl.'s Dep. at p. 98 lines 24-25, p. 99 lines 1-25, p. 107 lines 10-19, p. 130 lines 7-12, p. 131 lines 24-25, p. 132 line 1, p. 145 lines 1-6, p. 189 lines 3-11). Most of these complaints related to Love's strong disagreement with Patterson's assessment of his

performance,(Pl.'s Dep. at p. 86 lines 15-21, p. 106, lines 13-24, p. 107, line 10 through p. 110 line 24, p. 130 lines 7-25, p. 145 lines 1-25, p. 147, lines 1-17, p. 184, lines 6-10, p. 189, lines 3-11),  but one could be characterized as vaguely alluding to sex discrimination or hostile work environment. Specifically, on October 14, 2019, Love complained to Employee Relations regarding an email sent by his supervisor, Patterson, that invited the APO team to a "tea time" social activity, which Love claimed was discriminatory against men. (Id. at 8-9)(citing Pl.'s Dep. at p. 262 lines 14-25, p. 263 lines 1-24); (ECF No. 31-10). Patterson's email, subject line "Tea Time is still on today!" stated: "Good morning, I'm looking forward to today's tea time as I missed out last week. I have my hat and gloves and I'm ready to sip ☺ See you there! Edna." (Id. at 9)(citing Ex. 46 to Pl.'s Dep.; Pl.'s Dep. at p. 262 lines 14-25, p. 263 lines 1-24).

Love also submitted several complaints to the Audit and Compliance departments at St. Jude. (Id.)(citing Pl.'s Dep. at p. 196 lines 19 to 23). Eventually, Love met with Scott Long, the Chief Compliance Officer, and Leah Ladley, the Chief Audit Officer, in March 2019, regarding a complaint made on March 27, 2019, claiming that the method the APO used to account for travel expenses on the APO's billing worksheets violated Generally Accepted Accounting Principles ("GAAP"). (Id.)(citing Pl.'s Dep.

- 14 -

at p. 196 line 24 to p. 197 line 2). On April 30, 2019, Long and
Ladley investigated Love's complaints and gave him a memo
concluding that the existing processes for traveling, billing and
contract worksheets were compliant with GAAP. (Id.)(citing Ex. 36
to Pl.'s Dep.).

On July 10, 2019, after receiving his Written Warning for
unsatisfactory work performance from Patterson, Love again
contacted Long to "discuss some retaliation concerns."
(Id.)(citing Ex. 37 to Pl.'s Dep.). Love submitted another
complaint about accounting for travel expenses to Long on or about
August 23, 2019. (Id.)(citing Ex. 38 to Pl.'s Dep.). Long responded
to Love's concerns, and on October 2, 2019, a follow-up meeting
about the travel accounting for an APO physician was held between
Love, Dr. Russo, Patterson, Long, Ladley, Douglas, and two members
of the Financial Services Office (Page Pruitt, Director of
Disbursements, and Julie Meyer, the Director of General Accounts
and Financial Reports). (Id. at 10)(citing Ex. 39 to Pl.'s Dep.).
Long followed that meeting with a Memorandum summarizing the
meetings he had with Love regarding his allegations of retaliation,
wherein he responded to each specific allegation of retaliation
made by Love and concluded that the feedback on Love's performance
issues and instructions to place documents on the shared drive
were not retaliatory but instead laid out valid expectations that

were in line with St. Jude's practices. He particularly noted that
Love's refusal to place documents on the shared drive was contrary
to proper compliance practices. (Id.)(citing Ex. 40 to Pl.'s Dep.).

Love also made complaints that he was denied professional
development opportunities by Patterson and Dr. Russo. (Id.)(citing
Ex. 41 to Pl.'s Dep.). These "denials" of professional development
included one instance where Dr. Russo indicated he should only
attend conferences with a registration fee in the $50-350 range.
In another instance, Patterson suggested that $1,500 was a
reasonable total yearly budget for professional development for
staff members and recommended Fred Pryor online training courses
in lieu of Love's requests to attend expensive conferences in
Orlando, Florida and Las Vegas, Nevada. (Id.)(citing Exs. 41-42 to
Pl.'s Dep.; Pl.'s Dep. at p. 52 lines 4-9, p. 228 lines 19-25).
Love was not permitted to attend conferences of his choosing due
to cost and the conferences not being directly related to his
duties.[4] (Id.)(citing Ex. 42 to Pl.'s Dep.). Love could not (and
cannot) identify anyone on the administrative side of the APO who
was permitted to attend similar conferences. (Id. at 10-11)(citing
Pl.'s Dep. at p. 54 line 6 through p. 57 line 2).

---

[4]In his deposition, Love claims that the denial of attending one
of these conferences resulted in him being unable to maintain his
professional certification. (Pl.'s Dep. at p. 229 lines 20-23.)

On October 15, 2019, Love met with Douglas to complain about his annual performance review. Another member of St. Jude's Employee Relations Department, Christa Hawks, also attended. (Id. at 11)(citing ECF No. 31-10). Hawks identified that "Danny was unable to receive feedback during our meeting and . . . though his leadership provides him feedback, he perceives that as an attack. He seemed to not take any responsibility for any performance or attendance deficiencies he has, and he doesn't seem willing to make any changes." (Id.)

**E.    Love's Claims**

On December 2, 2019, Love filed a Charge with the Equal Employment Opportunity Commission ("EEOC"). Love's EEOC charge reads in full:

> I was denied an opportunity for training, harassed and disciplined by Edna Patterson (age 50's, Black, Female) Operations Manager and Carolyn Russo (age 60's, White, Female) Medical director. I have been employed with the above-named company since December 8, 2014, as a Financial Administrator. On October 28, 2019, I was terminated for my job performance, in which I deny.

> I was only Male employee in my department. I am aware of Toni House, Jennifer Morgan, Maureen Scurlock, Jennifer Morgan, Jennifer Ware, and Kaylynn (LNU) all females who were allowed to attend training, not disciplined, etc. Moreover, I was harassed with regards to wanting to monitor my whereabouts and that I never volunteered, etc. I complained to Kynis Douglas, and Dana Bottenfield of Labor Relations and nothing was done.

> I believe I have been discriminated because of my sex
> (Male) and in retaliation for complaining in violation
> of Title VII of the Civil Rights Act of 1964, as amended.

(ECF No. 31-12.) In the field "Discrimination Based on (Check appropriate box(es)", Love selected only "Sex." (Id.)

Additionally, Love attached to his *Pro Se* Complaint complaint a letter from the Crone Law Firm (which apparently represented Love at some point regarding his EEOC charge) to Karen Johnson, the Enforcement Supervisor at the EEOC. (ECF No. 1 at 9.) This letter stated, "We plan on filing an amended EEOC charge as soon as possible to include racial discrimination and retaliation." (Id.) No such amended charge was ever filed.

## II. PROPOSED CONCLUSIONS OF LAW

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden to "demonstrate the absence of a genuine [dispute] of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party has presented evidence sufficient

to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." Goins v. Clorox Co., 926 F.2d 559, 561 (6th Cir. 1991).

The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. Banks v. Wolfe Cty. Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence and are not sufficient to defeat a well-supported motion for summary judgment. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Similarly, a court may not consider inadmissible, unsworn hearsay in deciding a motion for summary judgment. Tranter v. Orick, 460 F. App'x 513, 514 (6th Cir. 2012). In order to defeat summary judgment, the party opposing the motion must present affirmative evidence to support its position; a mere "scintilla of evidence" is insufficient. Bell, 351 F.3d at 247 (quoting Anderson, 477 U.S. at 252). "In making this assessment, [the court] must view all evidence in the light most favorable to the nonmoving party." McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016). These standards apply regardless of a party's *pro se* status; "the liberal pleading standard for pro se parties is 'inapplicable' 'once a case has progressed to the summary judgment stage.'" George

- 19 -

v. Whitmer, 2021 WL 1976314, at *2 (E.D. Mich. May 18, 2021)
(quoting Tucker v. Union of Needletrades, Indus., & Textile Emp.,
407 F.3d 784, 788 (6th Cir. 2005)). A *pro se* party's opposition to
a motion for summary judgment cannot rely on "mere allegations and
unsworn filings" but must instead "set out specific facts showing
a genuine issue for trial through affidavits or otherwise," just
like any other summary judgment response. Id. (citing Viergutz v.
Lucent Techs., Inc., 375 F. App'x 482, 485 (6th Cir. 2010)).

**B.    Administrative Exhaustion**

St. Jude argues that Love's claims of race discrimination and
retaliation are procedurally barred due to his failure to
administratively exhaust these claims with the EEOC. (ECF No. 84-
3 at 4.) "[A]n employee alleging employment discrimination in
violation of [Title VII] must first file an administrative charge
with the EEOC within a certain time after the alleged wrongful act
or acts." Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 362
(6th Cir. 2010)(citing  42 U.S.C. § 2000e-5(e)(1)). "The charge
must be 'sufficiently precise to identify the parties, and to
describe generally the action or practices complained of.'" Id.
(quoting  29 C.F.R. § 1601.12(b)). "It is well settled that federal
courts do not have subject matter jurisdiction to hear Title VII
claims unless the claimant explicitly files the claim in an EEOC
charge or the claim can be reasonably expected to grow out of the

EEOC charge." Weigel v. Baptist Hosp. E. Tenn., 302 F.3d 367, 379 (6th Cir. 2002)(quoting Strouss v. Mich. Dep't Corr., 250 F.3d 336, 342 (6th Cir. 2001)). Pursuant to this rule, "where facts related . . . to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Weigel, 302 F.3d at 380 (quoting Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998)) (internal quotation marks omitted).

The EEOC provides charge forms on which claimants can describe the discrimination and check boxes indicating the type of discrimination alleged. However, these charge forms are not the exclusive way to file a charge of discrimination. The Supreme Court has stated that if a document filed with the EEOC is "examined from the standpoint of an objective observer" and "by a reasonable construction of its terms . . . requests the [EEOC] to activate its machinery and remedial processes[,]" it should be considered a charge. Fed. Express Corp. v. Holowecki, 552 U.S. 389, 403 (2008). For a filing to constitute a charge,

> the filing (1) must be verified – that is, submitted under oath or penalty of perjury; (2) must contain information that is sufficiently precise to identify the parties, and to describe generally the action or practices complained of; and (3) must comply with Holowecki – that is, an objective observer must believe that the filing taken as a whole suggests that the employee requests the agency to activate its machinery and remedial processes[.]

<u>Williams v. CSX Transp. Co., Inc.</u>, 643 F.3d 505, 509 (6th Cir.
2011) (internal citations and quotation marks omitted). Love's
EEOC charge reads in full:

> I was denied an opportunity for training, harassed and
> disciplined by Edna Patterson (age 50's, Black, Female)
> Operations Manager and Carolyn Russo (age 60's, White,
> Female) Medical director. I have been employed with the
> above-named company since December 8, 2014, as a
> Financial Administrator. On October 28, 2019, I was
> terminated for my job performance, in which I deny.
>
> I was only Male employee in my department. I am aware of
> Toni House, Jennifer Morgan, Maureen Scurlock, Jennifer
> Morgan, Jennifer Ware, and Kaylynn (LNU) all females who
> were allowed to attend training, not disciplined, etc.
> Moreover, I was harassed with regards to wanting to
> monitor my whereabouts and that I never volunteered,
> etc. I complained to Kynis Douglas, and Dana Bottenfield
> of Labor Relations and nothing was done.
>
> I believe I have been discriminated because of my sex
> (Male) and in retaliation for complaining in violation
> of Title VII of the Civil Rights Act of 1964, as amended.

(ECF No. 31-12.)

### 1. Race Discrimination Claim

St. Jude argues Love failed to exhaust his race discrimination
claim because he did not mark the box for race discrimination or
allege any facts relating to race discrimination in the EEOC
charging document. (ECF No. 31-1 at 7.) Although Love did not check
the race discrimination box, the Sixth Circuit has recognized that
"where facts related . . . to the charged claim would prompt the

EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Weigel, 302 F.3d at 380 (quoting Davis, 157 F.3d at 463 (internal quotation marks omitted).

Here, however, the undersigned finds that Love's race discrimination claim exceeds the scope of the charge and his administrative remedies remain unexhausted. The narrative on the EEOC charging document does not reference race discrimination. Its facts do not indicate that race discrimination had taken place or lead to such an inference. See George v. Aventis Pharm., Inc., 252 F. Supp. 2d 599, 604 (W.D. Tenn. 2003) ("Plaintiff makes no reference to the allegedly ageist comments made by [Defendant] nor to his alleged feelings of being harassed . . . Plaintiff's age harassment claim exceeds the scope of his EEOC charge."); see also Smith v. XPO Logistics, No. 19-cv-2741-SHL-tmp, 2021 WL 3046527, at *4 (W.D. Tenn. Feb. 25, 2021) ("The EEOC charge does not contain any allegations of retaliation, and none of the allegations reasonably relate or give rise to a claim of retaliation . . . [Plaintiff] failed to exhaust the administrative remedies available"), report and recommendation adopted, 2021 WL 3040762 (W.D. Tenn. Jul. 19, 2021). The only reference to race on the charge form is the parenthetical identification of the races of Patterson and Russo. (ECF No. 31-12.)

Additionally, Love attached to his complaint a letter from the Crone Law Firm to Karen Johnson, the Enforcement Supervisor at the EEOC. (ECF No. 1 at 9.) This letter stated, "We plan on filing an amended EEOC charge as soon as possible to include racial discrimination and retaliation." (Id.) It appears that this was never done. The mere statement of intent to file an amended charge does not itself constitute a charge. Williams, 643 F.3d at 509. The letter does not meet any of the requirements in Williams that define when a filing should be considered a charge. Id. The letter was not written under oath, it does not contain any information regarding the parties or actions complained of, and an objective observer would not believe that the filing is requesting the EEOC to "activate its machinery and remedial processes." Id. The mention of race discrimination and retaliation in this letter, standing alone, does not constitute administrative exhaustion of these claims. Because Love has not exhausted the administrative remedies for his race discrimination claim, it is procedurally barred.

2.    Retaliation Claim

St. Jude argues Love also failed to exhaust his retaliation claim because he "does not provide sufficient detail such that St. Jude could have reasonably inferred the allegations in his Complaint from the Charge." (ECF No. 31-1 at 8.) Although Love did not check the retaliation box, he did allege facts in the charging

- 24 -

document that "would prompt the EEOC to investigate a different, uncharged claim." Weigel, 302 F.3d at 380. (quoting Davis, 157 F.3d at 463) (internal quotation marks omitted). In the narrative portion of the EEOC Charge form, Love explains that he was terminated in October 2019. (ECF No. 31-12.) Love then alleges sex discrimination and notes that he "complained to Kynis Douglas, and Dana Bottenfield of Labor Relations and nothing was done." (ECF No. 31-12.) In the last sentence of the narrative, Love writes, "I believe I have been discriminated because of my sex (Male) and in retaliation for complaining in violation of Title VII . . ." (Id.) Love alleged enough to put the EEOC on notice to investigate a retaliation charge. Weigel, 302 F.3d at 381. Therefore, the undersigned finds Love's retaliation claim is not procedurally barred.

## C.  **Title VII Retaliation**

Title VII prohibits employers from "discriminat[ing] against . . . [an employee] . . . because [the employee] has opposed any . . . unlawful employment practice . . . or because [the employee] has made a charge" that the employer has engaged in an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that "discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment[.]" 42 U.S.C. § 2000e-2(a)(1). A Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 538 (6th Cir. 2008). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." Id. at 543-44 (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003) and Christopher v. Stouder Mem'l Hosp., 936 F.2d 870, 879 (6th Cir. 1991)). Because Love does not have direct evidence of retaliation and instead relies only upon circumstantial evidence, the McDonnell Douglas burden shifting framework applies. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Jordan v. Kohl's Dept. Stores, 490 F. App'x 738, 742 (6th Cir. 2012) (citing Spengler v. Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010)(applying McDonnell Douglas framework in the context of a Title VII retaliation claim)).

Under McDonnell Douglas, Love bears the initial burden of establishing a *prima facie* case of retaliation by showing (1) he engaged in a protected activity, (2) St. Jude knew about the protected activity, (3) St. Jude subsequently acted in a manner

that was "materially adverse" to Love, and (4) there was a causal connection between Love's protected activity and St. Jude's materially adverse act. Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (citing Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007) and Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006)). "The Supreme Court in Burlington Northern . . . made clear that the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." Hawkins v. Anheuser–Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008). "In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace." Id. (citing Burlington N., 548 U.S. at 64). "The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington N., 548 U.S. at 68); see also Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013) ("Further, the Supreme Court has recognized that actions typically construed as nonmaterial could rise to the level of an adverse employment action when considered in context[.]").

If Love meets his *prima facie* case requirement, "the burden
of production shifts to the defendant to articulate a legitimate,
nondiscriminatory reason for its employment decision." Melton v.
U.S. Dep't of Labor, 373 F. App'x 572, 576 (6th Cir.
2010) (quoting Yellow Freight Sys., Inc. v. Reich, 27 F.3d 1133,
1138 (6th Cir. 1994)). Should the defendant provide such a reason,
Love must then show that defendant's reason was
pretextual. See O'Donnell v. City of Cleveland, 838 F.3d 718, 726–
27 (6th Cir. 2016). To raise a genuine issue of fact as to pretext,
a plaintiff must show that (1) the proffered reason had no factual
basis, (2) the proffered reason did not actually motivate the
defendant's action, or (3) the proffered reason was insufficient
to motivate the action. Cicero v. Borg-Warner Auto., Inc.,  280
F.3d 579, 589 (6th Cir. 2002). Love can defeat summary judgment
only if his evidence is sufficient to "create a genuine dispute at
each stage of the McDonnell-Douglas inquiry." Kubik v. Cent. Mich.
Univ. Bd. of Trs., 717 F. App'x 577, 581 (6th Cir.
2017) (quoting Cline v. Catholic Diocese of Toledo, 206 F.3d 651,
661 (6th Cir. 2000)). "Although the burden of production shifts
between the parties, the plaintiff bears the burden of persuasion
through the process." Dixon v. Gonzales, 481 F.3d 324, 333 (6th
Cir. 2007).

There are two types of protected activity under Title VII: opposition and participation. See E.E.O.C. v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015) (citing 42 U.S.C. § 2000e-3(a)). The Sixth Circuit recognizes that the participation clause protects employees "who have participated in any manner in Title VII proceedings." Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008) (quoting Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000)). As for the opposition clause, "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning, . . . '[t]o resist or antagonize [. . .]; to contend against; to confront; resist; withstand.'" Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1957)). "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." Laster, 746 F.3d at 730 (citing Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 F. App'x 651, 655 (6th Cir. 2012)). Indeed, whenever any employee communicates "to her employer a belief that the employer has engaged in . . . a form of employment discrimination . . . , that communication virtually always 'constitutes the employee's opposition to that activity.'" Davis v. City of Memphis Fire Dept., 940 F. Supp. 2d

786, 797 (W.D. Tenn. 2013) (quoting Crawford, 555 U.S. at
276 (emphasis in original)).

1.   Complaints to Audit and Compliance Departments

Love's allegation that he was terminated in retaliation for
reporting operations issues to St. Jude's compliance, internal
audit, and accounting departments fail because he has not
established that he participated in a Title VII proceeding or
opposed a practice that Title VII prohibits with these reports.
(ECF No. 1 at 7.) Love did not participate in a protected activity
that would subject St. Jude to Title VII's anti-retaliation
provision, as these complaints related to business practices
rather than any form of Title VII discrimination. See 42 U.S.C. §
2000e-3(a); Niswander, 529 F.3d at 720; see also Slagle v. Cty.
Clarion, 435 F.3d 262, 268 (3d Cir. 2006) ("[W]e require only that
the plaintiff file a formal complaint that alleges one or more
prohibited grounds in order to be protected under Title VII.").

2.   Retaliation for Complaining to Human Resources

Love also appears to assert that he was retaliated against
for complaining to Human Resources about alleged sex
discrimination or hostile work environment. Assuming, arguendo,
that his complaints to Human Resources constituted protected
activity, and further assuming that St. Jude was aware of the
activity, Love has not put forth any evidence to create a genuine

dispute of material fact as to whether there was a causal connection between his protected activity and his discipline or termination. See Laster, 746 F.3d at 730. In Title VII retaliation cases, courts apply a but-for test to determine whether there is a causal connection between a plaintiff's protected activity and any materially adverse act. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2012) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.")

"Causation can be established by indicia of retaliatory conduct, such as evidence that the plaintiff was treated differently than similarly situated employees who did not engage in protective activity or evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity." Green v. Cent. Ohio Transit Auth., 647 F. App'x 555, 560 (6th Cir. 2016) (citing Evans v. Prospect Airport Servs., Inc., 286 F. App'x 889, 895 (6th Cir. 2008)). The temporal proximity between an employee's engagement in protected conduct and the materially adverse act also plays a role in the causation analysis, "though our circuit's case law is inconsistent on whether temporal proximity standing alone is sufficient [to] establish causation."

Id. (citing Evans, 286 F. App'x at 895; Mickey v. Zeidler Tool and Die Coe., 516 F.3d 516, 525 (6th Cir. 2008)). Nevertheless, "'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" Kuhn v. Washtenaw Cty., 709 F.3d 612, 628 (6th Cir. 2013) (quoting Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 472 (6th Cir. 2012)).

Love's only direct allegation that he suffered a materially adverse act as a result of his complaints to Human Resources is contained in his EEOC charge, in which he states, "I believe I have been discriminated because of my sex (Male) and in retaliation for complaining in violation of Title VII of the Civil Rights Act of 1964, as amended." (ECF No. 31-12.) The only arguable instance of sex discrimination or hostile work environment being reported to Human Resources in the record is Love's complaint about the tea party email on October 14, 2019. (ECF No. 31-10.) Love was subsequently terminated on October 28, 2019.[5] (ECF No. 31-1 at 7-8.) Because these events occurred so close in time, it is at least arguable that temporal proximity supports the but-for causation

---

[5]Notably, Patterson recommended Love for termination in a letter dated September 27, 2019, and Dr. Russo did the same on September 30, 2019. (ECF No. 31-3 at 7-8.) Both recommendations occurred before Love's complaint to Human Resources regarding sex discrimination or hostile work environment.

element of Love's *prima facie* retaliation claim. Green, 647 F. App'x at 560.

However, St. Jude has provided well-documented evidence of legitimate reasons to terminate Love's employment. In her September 27, 2019, four-page letter to senior leadership, Patterson provided four reasons that justified Love's termination: "(1) based on her analysis, Love's position was functioning at a 0.3 full-time equivalent (as opposed to a 1.0 full-time equivalent justifying a full-time role), (2) he regularly arrived between 9 and 9:30 a.m. and would depart between 3 and 4 p.m., (3) he regularly had inaccuracies in work output, and (4) there was frustration among the APO staff and leadership with these performance and attendance issues." (ECF No. 31-3 at 7.) Dr. Russo also recommended termination "[b]ased on the verbal warning for lack of attendance, the written warning of poor work performance, the FY19 performance evaluation and the most recent FY19 Quarter 4 invoice review documenting 6 of 11 invoices with errors." (Id. at 7-8.) Love's separation paperwork indicated the reasons for his termination were "his lack of attention to detail, incomplete/inaccurate reporting, lack of timely follow-through and inaccurate payments as documented by the quarterly invoice audit and reconciliation process." (Id. at 8.) Love does not present any evidence to create a genuine dispute that St. Jude's non-

discriminatory reasons for his termination were pretextual.
See O'Donnell, 838 F.3d at 726–27. Therefore, Love's retaliation
claim does not survive summary judgment.

**D.    Title VII Sex Discrimination**

To succeed on a Title VII sex discrimination claim, a
plaintiff must either produce direct or circumstantial evidence of
discrimination. Redlin v. Grosse Pointe Pub. Sch. Sys., 921 F.3d
599, 606 (6th Cir. 2019). Because Love does not assert that he has
direct evidence of discrimination, he must make a *prima facie* case
by establishing that: 1) he is a member of a protected class, 2)
he suffered an adverse employment action; 3) he was qualified for
his position; and 4) he was replaced by someone outside of the
protected class or was treated differently than similarly-
situated, non-protected employees. McDonnell Douglas, 411 U.S. at
802; Laster, 746 F.3d at 727. St. Jude argues that Love has failed
to establish a *prima facie* case because he has not identified a
similarly-situated female employee who was treated differently.
(ECF No. 31-1 at 8.)

"To be considered 'similarly situated' under the fourth
element, 'the plaintiff and the employee with whom the plaintiff
seeks to compare himself or herself must be similar in all of the
relevant aspects.'" Jones v. City of Franklin, 468 F. App'x 557,
562 (6th Cir. 2012) (quoting Ercegovich v. Goodyear Tire & Rubber

Co., 154 F.3d 344, 352 (6th Cir. 1998)). "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated[.]'" Ercegovich, 154 F.3d at 352; see also Arnold v. City of Columbus, No. 11-3459, 2013 WL 628447, at *6 (6th Cir. Feb. 20, 2013); Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008). "If a plaintiff claims to have received a harsher punishment than similarly situated employees, for example, one way that the plaintiff could establish a prima facie case would be to show that the employees with whom the plaintiff seeks to compare himself or herself reported to the same supervisor, were subject to the same standards, and 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Jones, 468 F. App'x at 562 (quoting Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 393 (6th Cir. 2008)). In order to be found similarly situated in the disciplinary context, "the plaintiff and [their] proposed comparator must have 'engaged in acts of comparable seriousness.'" Grice v. Jackson-Madison Cty. Gen. Hosp. Dist., 981 F. Supp. 2d 719, 728-29 (W.D. Tenn. Nov. 5, 2013) (citations omitted).

The adverse actions upon which Love bases his sex discrimination claim appear to be the disciplinary action taken against him for his attendance issues and accounting errors, the denial of training opportunities, and his ultimate termination. St. Jude does not contest Love's ability to satisfy the first three prongs of a *prima facie* case when addressing the disciplinary action and termination as adverse actions. (ECF No. 31-1 at 9-10.) When discussing the denial of training opportunities, St. Jude questions whether those denials would constitute adverse actions under the third prong. (Id. at 10.) St. Jude argues that even if the denial of training opportunities satisfies the third prong, his discrimination claim still fails because Love has unquestionably not met the fourth prong. (Id.)

In regard to Love's disciplinary action and termination, Love's claim of sex discrimination fails because he has not identified a similarly situated, non-protected employee who was treated more favorably, nor has he identified someone outside of his protected group who replaced him. Love has not provided any evidence of a similarly situated female employee at St. Jude who engaged in an act of comparable seriousness—e.g., who made serious invoice errors or refused to account for their time—much less an employee who did so and received more favorable treatment. Grice, 981 F. Supp. 2d at 728-29. As there is no evidence that Love was

treated any differently than a similarly situated female employee
who committed a similar infraction, there can be no reasonable
inference that Love's discipline or termination was the result of
discrimination.

Turning to the denial of training, it is unclear whether the
denial of training would constitute an adverse employment action.
"[T]he denial of training opportunities is only an adverse
employment action if it had a tangible impact on [plaintiff's]
growth, advancement, or compensation." Minevich v. Spectrum
Health-Meier Heart Ctr., 1 F. Supp. 3d 790, 808 (W.D. Mich. 2014)
(citing Blackburn v. Shelby Cnty., 770 F. Supp. 2d 896, 926 (W.D.
Tenn. 2011)). In his deposition, Love testified that he was unable
to maintain his professional certification because he was not
allowed to attend certain conferences, which could possibly affect
Love's growth and advancement. (Pl's dep. at p. 229 lines 20-23.)
However, even if St. Jude's refusal to send Love to these
conferences did constitute an adverse employment action, Love's
claim still fails because he has not identified any similarly-
situated female employees who were permitted to attend comparable
out-of-state conferences. When asked whether he could name any
person who went to a conference that charged approximately a one-
thousand-dollar registration fee, Love answered, "I would need to
see a list to identify the individuals." (Pl.'s Dep. at p. 57 lines

24-25.) Because Love has failed to establish a *prima facie* case of
sex discrimination, St. Jude is entitled to summary judgment.

### III. RECOMMENDATION

For the above reasons, it is recommended that the Motion for
Summary Judgment be granted.

Respectfully submitted,


s/ Tu M. Pham _____
TU M. PHAM
Chief United States Magistrate Judge

March 11, 2022 _____
Date


### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS
REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE
SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND
RECOMMENDATIONS.    ANY PARTY MAY RESPOND TO ANOTHER PARTY'S
OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A
COPY.    28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R.
72.1(g)(2).    FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS
MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER
APPEAL.**